UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CR-0076-CVE |
| ) | |
| MARK ANTHONY WILLIAMS, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is defendant's Motion to Suppress (Dkt. # 24). Mark Anthony Williams is charged in a two-count indictment (Dkt. # 11) with one count of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) and one count of possession of a firearm and ammunition after being convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Williams moves to suppress all evidence seized from him by the Tulsa Police Department (TPD) on March 19, 2010. He argues that TPD officers did not have a valid justification to stop him. A hearing was held on July 29, 2010. TPD officer James Bohanon testified on the United States' behalf and Lenora Davis, Williams's fiancée, testified on Williams's behalf.

**I.**

Officer Bohanon testified that on March 19, 2010, he and TPD officer Mark Wollmershauser were engaged in directed patrol activities in the area of the intersection of East 47th Place and South Darlington Avenue in Tulsa, Oklahoma. They were in an unmarked pickup truck traveling east on East 47th Place. Shortly before 2:00 p.m., the officers observed a group of five or more African-American males walking from Darlington Avenue northbound across East 47th Place. Bohanon

testified that the group crossed East 47th Place at approximately a seventy-five degree angle. He then observed the group walk westbound on the north side of East 47th Place, in the street and with the flow of traffic. The group was walking toward a convenience store. Bohanon testified that some members of the group left the street and walked on the grass or along a path toward the convenience store, but at one point, all members of the group had been walking in the street and with the flow of traffic.

The officers decided to make contact with the group after they observed that the group had not crossed East 47th Place at a ninety degree angle and that they were walking in the street and with the flow of traffic. Bohanon testified that he intended to tell the group to get out of the street because this was a particularly dangerous area to be walking in the street. Wollmershauser turned the truck around and stopped the truck near the convenience store. Williams was on the curb by the time the officers approached. Bohanon asked the group "what was up." He observed one member of the group trying to cross to the south side East 47th Place. He observed Williams turn around and act as if he were preparing to run away. Bohanon told him to stop, and Williams obeyed. At the same time, the person crossing to the south side of the street started to walk very quickly, and Wollmershauser followed after him. Bohanon had the rest of the group members place their hands on the hood of the police truck. While Williams was walking to the truck, Bohanon observed him pulling at his waistband. Bohanon testified that this made him nervous because the waistband is a common place for a weapon to be concealed. Once Williams was at the truck, Bohanon observed him reach into his waistband with his right hand and remove a handgun. Williams dropped the gun on the ground and then kicked it under the police truck.

After Wollmershauser returned, the officers placed everyone in handcuffs and patted them down. Wollmershauser performed record checks on the individuals while Bohanon retrieved the gun. He found that it was chamber loaded and had four rounds in the magazine. Williams was arrested for carrying a concealed weapon and then, after Wollmershauser discovered Williams's prior convictions, for being a felon in possession of a firearm.

Lenora Davis testified that, at approximately 2 p.m. on March 19, 2010, she was walking with Williams and Williams's two stepsons, Jerald and Dante Long. They also had a dog with them.[1] She testified that they never walked in the street with the flow of traffic, and that they were all walking together on the path the entire time. She testified that, before the police arrived at the convenience store, two men joined their group, one of whom was nicknamed "Black." Black and Dante Long knew each other, but Williams and Davis did not know Black. Davis testified that, when the police arrived, they asked only the men to place their hands on the hood of the truck and ignored her even though she was standing with the group in the parking lot. She testified that Bohanon told the men to "touch some hood." She testified that Black, not Williams, had the gun.

The Court finds Bohanon's testimony credible, and finds Davis's testimony not credible. It is implausible that a group of even four people could, as Davis testified, walk on the path together because the path is only about one foot wide. It is implausible that the officers would have ignored Davis while securing all the others. Further, it is unlikely that Bohanon told anyone to "touch some hood." Bohanon testified that he would never use the phrase, and that he told the group to "put your

---

[1] In rebuttal, Bohanon testified that there was a pit bull with the group. Defense counsel attempted to impeach Bohanon's testimony because he failed to mention the dog in his initial testimony. The Court finds nothing suspicious about Bohanon's failure to mention the dog. The officers did not initiate a stop of the dog.

3

hands on the hood." Bohanon testified that he was positive Williams was the one with the gun. The Court finds this credible. The Court does not find credible Davis's account that someone other than her fiancée - a person whose name she does not know and who knew only Williams's son - had the gun. Bohanon was about two arm's lengths away from the truck as these events transpired, and it is extremely unlikely that he was mistaken as to who pulled the gun out, dropped it, and kicked it under the truck.[2]

## II.

Williams argues that there was "no indication that 'criminal activity' . . . was 'afoot'" when the officers stopped the group of men and that the stop was a sham or pretense. Dkt. # 24, at 3. The United States argues that the officers observed Williams and the other members of the group violate a traffic regulation, and that is sufficient to justify a stop under Terry v. Ohio, 392 U.S. 1 (1980).

The Tenth Circuit recognizes three levels of encounters between police and citizens. Consensual encounters are not seizures within the meaning of the Fourth Amendment and do not require any suspicion of criminal activity. United States v. Villagrana-Flores, 467 F.3d 1269, 1273 (10th Cir. 2006). Terry stops and actual arrests, however, are seizures within the Fourth Amendment. Searches and seizures conducted without a warrant are per se unreasonable under the Fourth Amendment, subject to a few exceptions. Katz v. United States, 389 U.S. 347, 357 (1967). The government bears the burden of establishing an exception to the warrant requirement. United States v. Jeffers, 342 U.S. 48, 51 (1951).

---

[2] Williams was originally arrested for carrying a concealed weapon. Thus, the officers were not aware of Williams's prior convictions at the time of the initial arrest. There is no reason that they would have fabricated a story about Williams having the gun rather than another member of the group.

The nature of the encounter between police and a defendant dictates the level of cause required to justify a search or seizure. A formal arrest or a seizure that resembles a formal arrest must be supported by probable cause. United States v. Perdue, 8 F.3d 1455, 1461 (10th Cir. 1993) (citing Michigan v. Summers, 452 U.S. 692, 700 (1981)). "Recognizing that police officers must often act before probable cause can be determined, however, the Supreme Court adopted an intermediate approach" in Terry. Perdue, 8 F.3d at 1461. A Terry stop[3] must be supported by a "reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995). "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (quoting Scott v. United States, 436 U.S. 128, 136 (1978)).

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.' It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction.

United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

The relevant portion of the Tulsa Traffic Code provides:

---

[3] Terry concerned an investigative detention. The Tenth Circuit has held that the principles governing investigative detentions apply to traffic stops as well. See United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006).

> Where sidewalks are not provided, any pedestrian walking along and upon a roadway shall, when practicable, walk only on the left side of the roadway or its shoulder, facing traffic which may approach from the opposite direction.

TULSA REVISED ORDINANCES tit. 37, § 1104(B). Bohanon observed Williams walking in the street with the flow of traffic. Thus, the stop was based on an "observed traffic violation" and was valid under the Fourth Amendment. The fact that the officers may have had other subjective motives for stopping the group of men is irrelevant.

Williams's argument is essentially that, even given his violation, the totality of the circumstances did not justify a stop. See Dkt. # 27, at 3. This is unavailing. Bohanon's observation of a traffic violation alone was sufficient to justify the initial stop. Minor infractions such as illegal lane changes regularly provide justification for Terry stops. See, e.g., United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005) (Terry stop justified by motorist's failure to use a turn signal). In United States v. Taylor, 95 Fed. App'x 957, 961 (10th Cir. 2004), an unpublished case cited by Williams, the Tenth Circuit determined that a stop was justified when officers reasonably suspected that the defendant had violated a city trespassing ordinance. The Taylor court noted that "an officer with reasonable suspicion need not 'rule out the possibility of innocent conduct' as long as the totality of the circumstances suffices to form a 'particularized and objective basis' for a stop." Id. (quoting United States v. Vercher, 358 F.3d 1257 (10th Cir. 2004)). The Fourth Amendment requires nothing more than Bohanon's objectively reasonable belief that Williams was violating the

6

traffic ordinance.[4]  Bohanon's belief was objectively reasonable in this case because he observed the defendant engaging in exactly the conduct that the ordinance prohibits.

During the course of a Terry stop, law enforcement officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985).  Once he observed one of the group members possibly attempting to run away and Williams acting as if he would run away,  Bohanon was justified in ordering the group to place their hands on the truck hood and pat them down, in order to ensure officer safety during the encounter.

Williams does not dispute that the officers had probable cause to arrest him after they observed him remove a loaded gun from his waistband, throw it on the ground, and kick it under the police truck.

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress (Dkt. # 24) is **denied**.

**DATED** this 30th day of July, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[4]  In Taylor, the officers could not determine whether the loitering ordinance was being violated merely by observing the defendant; other circumstances, such as the fact that police had received a complaint, were relevant to the reasonableness of the officer's determination that a violation was occurring.  In this case, an officer can readily and quickly observe whether a person is walking with the flow of traffic; no other information is necessary to determine whether the traffic code is being violated.  Therefore, Williams's insistence that there were no other suspicious circumstances is misguided.